Daisy MARSHALL, Barbara Anderson, Barbara Davis and Barbara Warfield, Appellants,

v.

Roy KIRKLAND, Jr., W. F. Burney, C. W. Rial, J. L. Muscalino, Charles Drennan, Jr., L. F. Graves, J. D. Rohrscheib, Gene Tyler and J. C. Moore, Appellees.

No. 78–1237.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 15, 1978.

Decided Aug. 1, 1979.

---

**1286**

John W. Walker, of Walker, Hollingsworth & Jones, Little Rock, Ark., argued and on brief, for appellants.

David Solomon, Helena, Ark., argued and on brief, for appellees.

Before LAY and HEANEY, Circuit Judges, and HANSON,* Senior District Judge.

HANSON, Senior District Judge.

Appellants, plaintiffs below, appeal from the district court's[1] judgment entered after a bench trial to the extent the district court ruled adversely to appellants on their sex

and race discrimination claims. In an action brought under 42 U.S.C. §§ 1981, 1983 appellants and the class they represent sought relief from alleged violations of their Fourteenth Amendment due process and equal protection constitutional rights in connection with their employment as teachers in the Barton-Lexa School District. Jurisdiction in the district court was predicated on 28 U.S.C. §§ 1343(3), (4).

The representative appellants are black women who were employed as teachers in the Barton-Lexa School District. They represent the class of all black teachers and applicants and all female teachers and applicants in the district. Appellants alleged both class-based and incidental individual sex and race discrimination in connection with hiring, wages, promotion and job assignment. The defendants are the superintendent and individual members of the Barton-Lexa Board of Education.

The employment discrimination in issue is only such as would amount to a deprivation of constitutional rights. The complaint does not allege or seek relief for a violation of the statutory duty imposed by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. (1976).

The district court correctly applied the three-year limitations period in Ark. Stat.Ann. § 37–206. *See Clark v. Mann,* 562 F.2d 1104, 1112 (8th Cir. 1977). Since the complaint was filed on December 4, 1974, the district court addressed itself to claims arising from and after December 4, 1971.

We affirm in part, reverse in part, and remand for further proceedings.

**I.**

**A.**

The Barton-Lexa School District is a small rural district and has no incorporated towns or cities within its geographical area. During the years in question the district

---

* The Honorable William C. Hanson, Senior United States District Judge, Southern District of Iowa, sitting by designation.

1. The Honorable Oren Harris, Senior United States District Judge, Eastern District of Arkansas.

averaged a total yearly elementary and high school student population of approximately 900 students. Though the figures varied from grade to grade and year to year, the student body was consistently composed of about 60% blacks and 40% whites. Most of the teachers have been white, both before and after integration of the school district. In recent years the situation has become more proportionate. Thus in 1971–72, 72% of the teaching and administrative staff was white and 28% black. By 1977–78 the figures were 52% and 48% respectively.

Until the 1967–68 school year the district maintained a dual school system with separate schools for whites and blacks. A dual salary schedule was likewise maintained, one for black and one for white teachers. Commencing with the 1967–68 year the district began to implement a desegregation plan providing "freedom of choice" for grades one through nine, and integration in Barton High School for grades ten through twelve. This apparently continued until the 1972–73 school year and the advent of "unitization". The dual school system was thereupon abolished as the dual salary schedules had previously in the 1971–72 school year. The district became fully integrated, at least outwardly.[2] However, as the plaintiff-appellants argued "[t]he continuing discriminatory practices and policies of the school district since the dissolution of the dual school system constitute[s] the focus of plaintiffs' complaint." Brief for Appellants at 3.

The district court found itself in basic agreement with appellants on the existence of class-based discrimination subsequent to December 1971. It concluded:

In summary, it is clear, as a matter of law, that purposeful discrimination existed in every aspect of school life until the dual school system was abolished and the

unitized school system was established in the fall of 1972. Since unification [referred to as unitization by appellants] some phases of purposeful discrimination against black faculty members have continued. It follows that a prima facie case of purposeful racial discrimination was established with respect to assignment, salary, promotion and hiring of black faculty members for up to and including the 1972–73 school year and in some areas, such as assignment of duties, since. Thus, a rebuttable presumption in favor of individual relief has been established.

App. at 19. The district court's conclusion in this regard was essentially identical to that we reached in a previous factually and legally analogous case involving a similar Arkansas school district. See Williams v. Anderson, 562 F.2d 1081, 1091 (8th Cir. 1977). The finding is not challenged by the school board.

The district court also concluded, however, that with respect to those individual appellants to whom the court's prima facie finding applied the school district had successfully rebutted the presumption of racial discrimination. With respect to individual appellants outside the scope of the prima facie finding, the court also denied individual relief. Inasmuch as "no other teacher than the named teachers appeared seeking relief in the nature of back pay, reinstatement or claimed discrimination," App. at 35, no class member was awarded individual back pay or other equitable relief. The court did, however, shape a decree awarding class-based injunctive relief. The school district was directed to evenhandedly apply its teacher evaluation process to all teachers and to adopt objective, non-racial standards for use in connection with hiring, assignment, promotion and termination of employment of all district administrative, specialty, vocational and teaching person-

2. The district court concluded that "[s]ince unification some phases of purposeful [racial] discrimination against black faculty members have continued." For example, there is evidence that for a period of time after unitization blacks were hired to replace departing black teachers and that whites were hired to replace

white teachers. Also following unitization some classes were constituted largely on a racial basis, no blacks were assigned or promoted to higher paying administrative or head coach positions though qualified blacks were available, and seven whites but only two blacks were assigned to sought after "specialty" positions.

nel. The district was also directed to adopt a unified salary schedule and to take what amounted to a prescribed form of affirmative action to attain a racially balanced administrative, teaching, and specialty staff. The district court retained jurisdiction and required defendant-appellees to report their compliance with the decree.

As it relates to the district court's findings on the issue of race discrimination, appellants challenge the district court's denial of relief to any individual class members, and specifically, the district court's findings and conclusions with respect to the four representative parties. Part of their complaint is procedural. Appellants assert that after the district court rendered its finding that a prima facie case was established, individual class members were entitled to a separate opportunity to come forward and assert individual claims for relief. The district court treated the two-day trial before it as a plenary submission, and appellants appear to claim that it was error to do so.

Defendants do not appeal.

### B.

Appellants' complaint also alleges gender-based discrimination. Women have predominated as teachers in Barton-Lexa School District by a ratio of between three and four to one. Evidence was presented to the district court which indicated that the assignment to "specialty" positions (a position with extra duties for which an increment in compensation was provided), and promotion to one of the three administrative positions in the district (principal of the elementary school, principal of the high school, and superintendent of the district) was influenced by the sex of the employee and statistically favored males with a concomitant differential in pay as between men and women.

The district court concluded:

the plaintiffs have failed in their burden of presenting any testimony to the effect that discrimination due to sex existed

within a period of 3 years from the commencement of this litigation.

App. at 21. Plaintiffs appeal from this determination that they failed to prove a prima facie case of sex discrimination.

In view of the foregoing, three issues are presented by this appeal which we treat in the following order: (1) whether with regard to alleged race discrimination the district court was clearly erroneous or contrary to law in its conclusion that none of the named representatives of the class was entitled to individual relief; (2) whether the district court erred in treating the two-day trial as a plenary submission, thus not affording victims of race discrimination an additional opportunity to assert individual claims; and (3) whether the district court was clearly erroneous or contrary to law in its finding that plaintiffs failed to establish a prima facie case of sex discrimination.

### II.

### A.

We begin our analysis of the individual claims of the named class representatives by noting that this Court has twice before dealt with similar factual and legal issues in *Williams v. Anderson, supra* and *Clark v. Mann, supra.* In both cases we recognized that recent Supreme Court decisions[3] had established that "plaintiffs must prove an intent to discriminate on the part of the defendants to prevail in a § 1983 action." *Williams v. Anderson,* 562 F.2d at 1086. See *Clark v. Mann,* 562 F.2d at 1112. Mindful of the Supreme Court's observation that proof of an "invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977), and because rebuttable presumptions triggered by proof of a prima facie case had been successfully employed to fully air com-

---

**3.** *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).

plaints of discrimination under Title VII, this Court concluded that "evidence of discriminatory intent may be sufficient to establish a prima facie case of racial discrimination and to create a rebuttable presumption in favor of individual relief." *Williams v. Anderson,* 562 F.2d at 1087. *See Hazelwood School District v. United States,* 433 U.S. 299, 307–09, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *Castaneda v. Partida,* 430 U.S. 482, 492–95, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. at 270–71 n. 21, 97 S.Ct. 555; *Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The requisite proof must often depend on reasonable inferences from objective fact. *See Personnel Administrator of Massachusetts v. Feeney,* —— U.S. ——, ——, 99 S.Ct. 2282, 60 L.Ed.2d 870, nn.24, 25 (1979). "There is no 'inflexible formulation' of what constitutes a prima facie case . . it varies with respect to differing factual situations." *Williams v. Anderson,* 562 F.2d at 1088.

Here the district court found that plaintiffs established a prima facie case of purposeful, class-based racial discrimination up to and including the 1972–73 school year in connection with the assignment, salary, promotion and hiring of black faculty members. This finding is not disputed, nor is there any dispute that upon establishing such a prima facie case it was incumbent on defendants to rebut the consequent presumption in favor of individual relief for persons in the affected class. The scope of the prima facie case found by the district court is a limited one. It extends only up to and including the 1972–73 school year and, more vaguely, extends beyond that time frame "in some areas, such as assignment of duties." We are not certain from the district court's memorandum whether by implication the court found against a prima facie case outside of the ambit of the specified time frame except for the "some areas" referred to, and we do not know precisely the extent of the prima facie case in school

years subsequent to 1972–73. In any event, the district court gave appellants Daisy Marshall and Barbara Anderson the advantage of the rebuttable presumption. The district court's analysis does not explicitly indicate whether the school district rebutted the presumption in Barbara Davis' case, however, since her employment clearly fell within the range of the district court's finding of a prima facie case, we assume the burden was on the school district to prove a lack of invidious intent. Barbara Warfield was apparently treated as outside the prima facie case and hence retained the burden of proof.

The district court found a prima facie case in connection with the "assignment, salary, promotion and hiring of black faculty members". Each of the class representatives complains primarily of the non-renewal of her teacher contract and consequent termination of employment, a matter inhering in the "hiring" category since under Arkansas law each of the individual appellants was in effect not rehired (or "renewed") for the year following the last year of employment. *See* Ark.Stat.Ann. §§ 80–1245, –1246, –1304(b); *Clark v. Mann,* 562 F.2d at 1114–15. Barbara Davis also complains of her assignment as a social studies teacher, but her teaching assignment is closely associated with the non-renewal of her contract. Thus the basic issue with respect to each of the representative parties is whether the district court clearly erred in concluding that race was not a motivating factor in the decision not to renew the teacher contract. *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. at 265–66, 97 S.Ct. 555.

B.

*Daisy Marshall*

Daisy Marshall began her duties as an elementary social studies teacher in 1970. Her contract was renewed each year for three consecutive years. In her fourth year, Mrs. Marshall assumed the additional responsibility of teaching remedial math. On the recommendation of Mrs. Todd, prin-

cipal of the elementary school, the school board voted not to renew Marshall's teaching contract for the 1974–75 school year. Mrs. Todd in a letter to defendant school superintendent Roy Kirkland dated February 26, 1974, enumerated five reasons for not recommending renewal of Mrs. Marshall:

1. It is my opinion that she is not well informed in subject matter.

2. She is unable to follow suggestions.

3. For the past two years, we have tried her in different teaching areas with no better results.

4. The lesson plans that are required by the school board have not been made.

5. The students deserve the very best teacher that can be found.

By letter from Mr. Kirkland dated May 2, 1974, Mrs. Marshall was informed that the school board had voted not to renew her contract for the 1974–75 school year. Mrs. Marshall requested and was accorded a hearing before the board pursuant to procedures established by state law. See Ark. Stat.Ann. § 80–1246. No change in the board's decision not to renew Mrs. Marshall's contract resulted.

Mrs. Marshall attacks the factual basis of Mrs. Todd's reasons and points to three areas of antagonism between her and Mrs. Todd. These concern the use of teacher evaluation forms, Mrs. Marshall's pregnancy during the 1973–74 school year, and Marshall's teaching of a predominantly black remedial math class. During the 1973–74 school year the district initiated the use of formal evaluation of teachers. Evaluation forms were employed which contained twenty-three categories for critique classified into three groupings under the headings "Personal Qualifications," "Classroom Management," and "Instruction." Teachers were rated "unsatisfactory" or "satisfactory" in each category. School principals conducted the evaluations. Mrs. Marshall asserts that the evaluation process was nonetheless primarily subjective due to the lack of a uniform set of standards under which to judge performance under the various categories, and thus the evaluation forms enabled the perpetuation of race discrimination.

Mrs. Marshall and Mrs. Todd also had a dispute concerning Marshall's continued employment during her pregnancy. School policy required pregnant teachers to take leave at some point during pregnancy. Mrs. Marshall testified that Mrs. Todd asked her to resign because of the pregnancy. The conflict over Marshall's pregnancy continued until preempted by intervening court decisions.

Lastly, Mrs. Marshall points to difficulty in connection with her remedial math class. Mrs. Todd was said to have relayed complaints from parents of a white child about the classroom seating of their child in the proximity of black children. Mrs. Marshall also testified that she resisted Mrs. Todd's urgings to promote the children of "gypsy" parents—the children of itinerant school district residents. Mrs. Marshall asserts that the incidents involving the white child and the "gypsy" children were "racial incidents," and that "[t]he district court failed to take notice of this racial factor which, combined with other events," affected Mrs. Todd's evaluation of Marshall.

The evaluation system initiated by the school district called for at least three written evaluations, one after six weeks of teaching, one in November, and the third after the first of the year. The district court found that Mrs. Marshall was evaluated on a number of occasions during her final year of employment, apparently with accelerating frequency as her teaching deficiencies were noted. In a written evaluation of November 12, 1973 Mrs. Todd stressed the need for written lesson plans. The lack of planning was a preeminent factor for not renewing Mrs. Marshall's contract stressed by Mrs. Todd in her testimony, and both Marshall and Todd testified that Todd worked with Marshall early on in the 1973–74 year to develop a planning method for her remedial math class. The extent to which Mrs. Todd discussed the perceived deficiency in the lesson plans with Mrs. Marshall is unclear from the testimony and was disputed, but Mrs. Marshall con-

ceded in the spring of 1974 Mrs. Todd "by word of mouth . . . told me I needed to keep more plans." App. at 434. Mrs. Marshall claimed, however, that her method of planning lessons was consistent with what Todd and Marshall had discussed at the beginning of the year, and she suggested that the complaints about her planning were a pretext for dismissing her because of her pregnancy. While Mrs. Marshall was away from school with an illness caused by her pregnancy, Mrs. Todd removed her plan book from her room[4] and made copies of several pages. Mrs. Marshall testified that when the book was returned to her several pages she had written on notebook paper and attached to the plan book were missing. This was close in time to when Mrs. Marshall told Mrs. Todd that she was pregnant.

Mrs. Todd denied any invidious or pretextual reason for her decision not to recommend Mrs. Marshall for renewal, and testified that her reasons were as stated in her February 26, 1974 letter to Mr. Kirkland. Whether the school district successfully rebutted the presumption in favor of individual relief by showing that race was not a motivating factor in Mrs. Marshall's non-renewal is therefore largely a question of whether Mrs. Todd's testimony is to be credited or, instead, whether the evidence Mrs. Marshall points to creates an inference of race discrimination sufficient to withstand the school district's rebuttal. The district court necessarily credited Todd's testimony for it concluded:

> the defendant School District met its burden of rebuttable presumption and, from the record, the reason for the decision of the School Board on recommendation of the superintendent and principal, that Mrs. Marshall's contract not be renewed, was due to reasons, as established by the record other than racial."[5]

App. at 24. In this regard the district court also found persuasive the fact that Mrs. Marshall was replaced by a black teacher, Lula Roberts.

When the determination of an issue depends heavily on the credibility of witnesses appearing before the district court, the scope of review of an appellate court in determining whether the pertinent factual findings are clearly erroneous is confined by the rule that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Rule 52(a), F.R.Civ.P. Further, this Court has recently reiterated:

> [A] finding of fact is only deemed clearly erroneous if it is not supported by substantial evidence, if it proceeds from an erroneous conception of the applicable law, or if on a consideration of the entire record the appellate court is left with the definite and firm conviction that a mistake has been made.

*Southern Illinois Stone Co. v. Universal Engineering*, 592 F.2d 446, 451 (8th Cir. 1979). *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). We find no substantial or compelling evidence in the record requiring us to discredit Mrs. Todd's testimony contrary to the district court, the district court's finding that the reasons for Mrs. Marshall's non-renewal were those stated by school administrators is supported by substantial evidence, and we have not formed a firm conviction that a mistake has been made. The school district successfully rebutted the presumption in favor of individual relief.

*Barbara Davis*

Barbara Davis was employed by the school district for the 1971–72 year. Her contract provided that she was to teach

---

**4.** Mrs. Todd testified that this was in connection with a routine examination of all teacher plan books.

**5.** The district court also found that Mrs. Marshall had failed to establish any right to relief in view of the facts that she gained similar employment with another school district for the following year, did not sufficiently establish a

wage differential for back pay purposes, and did not seek reinstatement with the Barton-Lexa schools. We do not reach this issue because of our conclusion that the district court's finding that the board did not purposely discriminate against Mrs. Marshall is not clearly erroneous.

physical education and "social studies," though Mrs. Davis was not certified to teach social studies. When she began work, Mrs. Davis was assigned to teach two seventh grade geography classes and a class in world history. Geography and world history were evidently considered a part of social studies.

Mrs. Davis had difficulty teaching the geography and world history courses and early in the academic year this came to the attention of then principal of the Barton High School, Roy Kirkland. Kirkland evaluated Davis on a number of occasions commencing in September 1971. In the first evaluation Kirkland noted that Mrs. Davis' knowledge of both geography and world history was limited. Mr. Kirkland and Mrs. Davis conferred on at least several occasions about the difficulty Mrs. Davis was having with her social studies teaching duties. There appears to be no question that Mrs. Davis was aware of her inability to adequately teach her assigned social studies classes; indeed, she testified that she attempted to retain a remedial social studies class she "could have handled" (App. at 557), but was assigned instead to the world history class.

In contrast there is no dispute that Mrs. Davis was a very good physical education teacher. In the letter from superintendent K. M. Allbritton notifying Mrs. Davis of the decision of the school board not to renew her contract, Mr. Allbritton wrote: "We have been well pleased with your P.E. program." Subsequently, Mr. Allbritton wrote a letter of reference on Mrs. Davis' behalf stating in part:

> In my observations of her teaching, I have found her to be a very adequate P.E. teacher but somewhat lacking in her ability to teach social studies. Mrs. Davis seems to be much more concerned and knowledgeable in P.E. and I feel that she has the potential to be a very strong teacher in the field of physical education.

In February 1972 Mr. Kirkland indicated to Mrs. Davis that he did not believe she was qualified to teach social studies and that she should seek other employment. On February 23, 1972 Mr. Allbritton sent his letter to Mrs. Davis formally notifying her of the non-renewal of her teaching contract. Allbritton stated in the letter that "[t]he reason for this action was that you were not certified to teach social studies, and in all probability, three social studies classes would need to be taught by the teacher who would be in your position for the 1972–73 school year." [6]

Mrs. Davis requested a hearing before the school board. A hearing date was set, but the hearing was never conducted. The district court found that Mrs. Davis and her attorney failed to appear at the scheduled time.[7]

Mrs. Davis was succeeded by fellow plaintiff Barbara Anderson as girls' physical education teacher.

The district court implicitly found that the school district had rebutted the presumption in favor of individual relief and that Mrs. Davis'

> termination was not motivated for impermissible reasons but that her ineffectiveness as a teacher in the areas she was employed to teach were the primary reasons for her termination.

App. at 31.

Mrs. Davis assails the district court's conclusions from the record, and points to several items of evidence which she asserts show that her lack of certification to teach social studies was a pretext to mask racial discrimination. *Cf. Moore v. Board of Education of Chidester School District*, 448 F.2d 709, 713 (8th Cir. 1971). She points to evidence that on two occasions uncertified white teachers were allowed to remain in the district's employ and work toward ob-

---

6. The reason for Mrs. Davis' non-renewal was stated pursuant to a written request from Mrs. Davis after Mr. Kirkland indicated the likelihood that her contract would not be renewed. Arkansas law requires a statement of reasons upon timely request. Ark.Stat.Ann. § 80–1246.

7. No Due Process issue is raised in this regard and in any event the district court's finding that Mrs. Davis failed to appear is not clearly erroneous.

taining certification, and she notes that she was certified to teach general science but when a mid-year vacancy in chemistry and biology opened up it was filled by elementary school principal Todd's daughter. Mrs. Davis also testified that Mr. Kirkland pressured her to give preferential treatment to children of influential members of the community, to give a passing grade to a white physical education student, and to give grades to two others who had never attended class. She stated she resisted this pressure. Lastly, Mrs. Davis had several discussions with school administrators on race-related problems in the high school. These included the lack of black cheerleaders and superintendent Allbritton's policy on the selection of class kings and queens and the like. In regard to these matters, but without explaining his meaning, Mrs. Davis testified that Allbritton told her on one occasion that the school district "had two sets of rules, one for blacks and one for whites." Mr. Allbritton, no longer employed with the school district, did not testify.

We, as the district court appeared to, view the question of whether defendants rebutted the presumption in favor of individual relief as a close case. We conclude, however, that the district court's finding is not clearly erroneous. Mrs. Davis was succeeded by a black teacher. By neither objective or subjective standards was she qualified to teach the social studies courses assigned to her. There is no compelling reason in the record to discredit the testimony of Mr. Kirkland apparently credited by the district court, and the totality of evidence is fully consistent with the essence of the district court's factual findings that Mrs. Davis' contract was not renewed because she was not the right teacher to fill the physical education/social studies slot created by the school district's needs. For example, the fact that subsequent to her notification of non-renewal, Mrs. Davis requested and superintendent Allbritton gave a frank and favorable recommendation of Davis' physical education teaching abilities to a nearby school district supports the conclusion that Davis' qualifications and the district's needs did not match. The evi-

dence Mrs. Davis relies on, while it might well have withstood rebuttal, does not compel that result. That in some respects school administrators made promises to Mrs. Davis that were not kept and knowingly assigned her social studies classes she was not objectively qualified to teach appears likely, but the record supports the district court's conclusion that race was not a motivating factor in the non-renewal of her contract.

*Barbara Anderson*

Barbara Anderson succeeded Barbara Davis as a physical education teacher in the Barton High School. She was first employed for the 1972–73 school year and her contract was renewed for the 1973–74 school year. Ms. Anderson's difficulties with the school system stemmed from problems in her relationships with students in her physical education class and a failure to follow school policies.

During the first year of her employ, Mr. Kirkland was principal of the school. At the end of that year Kirkland recommended that Ms. Anderson's contract be renewed only if she completed several additional hours during the summer enhancing her social studies background, and he stated that Ms. Anderson had been warned that recurring infractions of school rules could result in the termination of her employment.

Ms. Anderson's problems continued into the following year. The evidence reflects several instances of purported rule violations and difficulty in controlling students. In the presence of principal David Bagley (who replaced Mr. Kirkland when the latter was promoted to superintendent), Ms. Anderson told two girls who she claimed had threatened her, "If you attack me I will knock your teeth out." On another occasion Ms. Anderson reported that a white girl had slapped her. The student was disciplined, but Ms. Anderson asserted that it was not as severe as that meted out to a black student who had slapped a white teacher. The primary and allegedly most

recurring rule violation testified to by principal Bagley was Ms. Anderson's requests to other teachers to remove students from the other teachers' classes for various reasons and lengths of time. Written rules and suggestions in a pamphlet entitled "Teacher Policies and General Suggestions" required that a teacher desiring to take a student from another teacher's class obtain the permission both of the other teacher concerned and the principal. Bagley testified to several instances of violations of this policy by Ms. Anderson. There was evidence that the track and football coach had been reprimanded for a similar rule violation.

Ms. Anderson was also criticized and counseled with by school administrators regarding the conduct of her classes and the handling of individual instances of student misconduct. Mr. Bagley testified to an incident in which Ms. Anderson put a student out of her physical education class for significantly longer than the three days allowed by school policy. On other occasions she sent students to study hall as a form of discipline, though Mr. Bagley had directed her not to. A requirement that physical education students attend at least five basketball games and keep a score card was overruled by principal Bagley. After "quite a few" students failed one six-week grading period of physical education, Mr. Kirkland and Mr. Bagley conferred with Ms. Anderson about her policy of only giving two test grades for an entire six weeks. Kirkland and Bagley felt that two graded tests over a period of six weeks was not enough of a basis on which to predicate a period grade. Mr. Bagley also testified to occasions on which Ms. Anderson permitted students to participate in her physical education class who at the time should have been elsewhere, and Bagley stated he told Ms. Anderson he did not want "hangers-on" in the vicinity of her class.

On February 26, 1974, Mr. Bagley advised the members of the school board by letter that a decision whether Ms. Anderson would be recommended for renewal would be withheld pending further observation of her duties by Bagley. Several of the incidents noted above occurred after Mr. Bag-

ley's February 26 letter. Later in the school year Bagley recommended that Ms. Anderson's contract not be renewed primarily for failing to follow school policies and to satisfy the requirements of a physical education teacher. After the ensuing notification of her termination, Ms. Anderson requested and was granted a hearing as provided by Arkansas law. Her contract was not renewed for the following year.

The district court concluded that the defendants had rebutted the presumption in favor of individual relief, and found that the employment decision of the school board resulted primarily because of Ms. Anderson's "ineffectiveness as a teacher" and that race was not a motivating factor.

This finding is not clearly erroneous. Many of Ms. Anderson's school policy violations were pointed out to Mr. Kirkland or Mr. Bagley by white students or their parents. She argues, "[i]t was as if there was a concerted effort on the part of white parents and students to harass her." Appellants' Brief at 31. In this regard, Ms. Anderson claims that she "did not receive strong support from the school administration" particularly in some conflicts with students, though she concedes that "[o]ccasionally, the principal and superintendent would side with her in disputes with white parents . . . ." Appellants' Brief at 32. Ms. Anderson also claims disparate and selective application of the school policies in issue.

We are aware of and sensitive to the inferences which could be drawn from the aspects of the record highlighted by Ms. Anderson. Some of the policies she is said to have violated are vague and subject to interpretation. There was antagonism in her relations with some students which brought Ms. Anderson frequently to the attention of Messrs. Bagley and Kirkland. But, crediting Bagley and Kirkland's testimony, Ms. Anderson was apprised of her inadequacies and she was afforded an opportunity to correct them. The facts that she was rehired for a second year with the admonition that she obey school rules, and

Mr. Bagley prolonged his observation of Ms. Anderson prior to recommending non-renewal, support a finding of a lack of invidious intent. We therefore affirm the district court's findings with respect to Ms. Anderson.

### Barbara Warfield

Barbara Warfield's case does not require extended discussion. Ms. Warfield, an elementary education and social studies major, and five other teachers were employed for the 1973–74 school year with funds under a federal grant pursuant to the Emergency School Aid Act. 20 U.S.C. § 1601 *et seq.* Three of the ESAA teachers were black, and three were white.

The grant was not continued beyond one year. The school district, however, had three vacancies to fill for the following year, and these were filled with the ESAA teachers. Two of the black teachers and one white teacher were hired into the vacancies. Ms. Warfield was not recommended for the position by Mrs. Todd, her principal, and was not one of those hired.

Ms. Warfield received a certified letter notifying her that her contract would not be renewed. She requested and received a hearing before the school board where the decision was affirmed.

 The district court concluded that Ms. Warfield's contract was not renewed because of the lack of further federal funding, and that race was not a motivating factor in the employment decision. We have considered Ms. Warfield's arguments,

and conclude that the district court's findings in her case are not clearly erroneous.[8]

### III.

 This action was brought and maintained as a class action pursuant to Rules 23(a), (b)(2), F.R.Civ.P. Though Rule 23(b)(2)[9] relates to class claims on which declaratory and injunctive relief is sought, this Court has observed in conformity with the majority of federal courts, that the fact pecuniary relief in the form of back pay is "sought incidental to injunctive relief will not preclude certification under Rule 23(b)(2)." *Sperry Rand Corp. v. Larson*, 554 F.2d 868, 875 (8th Cir. 1977). To avoid undue rigidity in Rule 23(b)(2) class actions involving employment practices, it also seems evident that while entitlement to some forms of relief such as back pay or reinstatement must often proceed on an individual rather than a class basis, that fact should not prevent a district court from determining issues of individual relief incidental to class-wide issues in a Rule 23(b)(2) class action. *See Bolton v. Murray Envelope Corp.*, 553 F.2d 881, 885 (5th Cir. 1977); *Arkansas Education Assoc. v. Board of Education*, 446 F.2d 763, 768 (8th Cir. 1971); 7A C. Wright & A. Miller, Federal Practice and Procedure § 1775, at 23. It follows that normally individual class members must have an opportunity at some point to come forward and claim particular relief due them and, correspondingly, that defendants be permitted to rebut a prima facie case in individual instances.[10] *See*

---

**8.** Appellants also assert that the district court erroneously denied relief to Raymond Harris, a black social studies teacher with fifteen years of employment in the school district. Mr. Harris testified that when he came to the school district in 1962 his professional aspiration was to be a principal, but he stressed "that would be then." App. at 535. Harris was not certified as a principal and there is no evidence that he wanted to or attempted to apply for a principal job during the relevant years. Similarly there is no evidence that he sought or would have sought a specialty position. On cross-examination he testified that he had no information since 1969 of any difference in pay between white and black teachers. App. at 551. Under these circumstances, the district court

was not clearly erroneous in denying individual relief.

**9.** A Rule 23(b)(2) class action is appropriate where:

the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole.

**10.** Though unclear, appellants also appear to argue that the district court should have awarded class-wide back pay to the class of black teachers and applicants affected by racial discrimination in assignment, salary, promotion and hiring. In the area of employment discrim-

*Williams v. Anderson,* 562 F.2d at 1081; *Clark v. Mann,* 562 F.2d at 1117. The Federal Rules of Civil Procedure contain ample flexibility to see that this is done, *see* Rules 20(b), 23(d), 42(b), F.R.Civ.P., and the responsibility for an ordered presentation is shared by the parties and the court. In many class actions, particularly those in which a prima facie case of a pattern or practice of employment discrimination is proved, "a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." *International Brotherhood of Teamsters v. United States,* 431 U.S. at 361, 97 S.Ct. at 1867. *See, e. g., Myers v. Gilman Paper Corp.,* 544 F.2d 837, 853–54 (5th Cir.), *cert. denied,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). Class actions, though, vary widely in scope and context, and the district court retains substantial discretion under Rule 23(d) to structure the course of a class action to insure a fair and efficient trial of such individual claims as may exist. *See Forbes v. Greater Minneapolis Area Board of Realtors,* 61 F.R.D. 416, 417 (D.Minn.1973). *See generally Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 355–59, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). Thus, this Court has previously enforced an agreement between court and counsel limiting the availability of individual relief to those class members who testified at a single plenary trial.

*Clark v. Mann,* 562 F.2d at 1110–11. An equivalent agreement is present here.

■ Appellant plaintiffs assert that the district court denied them an adequate opportunity to come forward to present the individual claims of class members to specific forms of relief. In their words:

> The plaintiffs . . . assert . . . that during the two day trial, plaintiffs' counsel attempted to prove class discrimination. Only after the [District] Court rendered its decision with a finding of class discrimination have plaintiffs been in a position to present the question of specific relief for class members.

Appellants' Brief at 36. We do not agree. The record shows that appellants attempted to prove both class and individual entitlement to relief, and we see no conceptual reason in this case for requiring the district court to find class discrimination before entertaining evidence supportive of incidental claims for individual relief. More importantly and similar to *Clark v. Mann, supra,* our review of the record indicates that the district court operated under the reasonable belief that the case was fully submitted to him at the close of the two-day trial, a belief apparently shared by the parties at trial. The following colloquy is illustrative:

> THE COURT: . . .
>
> Very well, gentlemen, everything that has been suggested and agreed to here

---

ination, this Court has previously indicated that "[b]ack pay is a fundamental remedy and should be denied only in extraordinary circumstances." *Wells v. Meyer's Bakery,* 561 F.2d 1268, 1272 (8th Cir. 1977). Where possible an individually determined remedy as opposed to a class-wide back pay remedy should be employed "because it will best compensate the victims of discrimination without unfairly penalizing the employer." *Stewart v. General Motors Corp.,* 542 F.2d 445, 452 (7th Cir. 1976), *cert. denied,* 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977). Disparity in base salaries between black and white teachers was eliminated in the Barton-Lexa district upon adoption of a unified salary schedule for the 1971–72 school year. Thus the limitations period bars recovery of back pay prior to the adoption of the unified schedule. As a consequence, back

pay in this case would only be available incidental to reinstatement such as the representative parties seek, or because blacks are discriminated against in connection with promotion or assignment to administrative or specialty positions. Entitlement to relief in this latter regard, though partially subjective in view of the school district's relatively informal employment policies, would necessarily predicate itself in part on a threshold showing of objection qualification. Moreover, the number of administrative and specialty positions is limited and it would obviously be overbroad to afford a class-wide back pay remedy. Accordingly, any back pay award in this case calls for an individually determined remedy. *Cf. International Brotherhood of Teamsters v. United States,* 431 U.S. at 369, 97 S.Ct. 1843.

could be supplied to this court in fifteen days, could it not?[11]

MR. SOLOMON [defendants' attorney]: Yes.

MR. WALKER [plaintiffs' attorney]: Yes, sir, I think so.

THE COURT: All right at that time at the end of fifteen days we will close the record. I am not sure what requirement you indicated the Court should make of you.

MR. WALKER: Maybe you are talking about briefing and proposed Findings of Fact, but whatever they are, your Honor, I would request that if within the fifteen day rule . . . that we be given leave in the event that something comes forward, from the School District . . . that we be allowed . . . within a period of five days a response . . . some opportunity to respond after the School District has put in its minutes in compliance with the Court's suggestion.

THE COURT: Well, obviously, if there is anything that develops that should be in the record that is filed in accordance with the agreement here, then the Court would retain the perrogative [sic] of including any other appropriate matter in the record.

. . . . . .

THE COURT: Very well, then we will proceed accordingly and when the record is closed, the Court will take the case under submission. You gentlemen will file your respective views in the matter as the nature of a brief or do you want the Court to take it as submitted.

MR. WALKER: Your Honor, I think it should take it as submitted.

MR. SOLOMON: I thoroughly concur

. . . .

THE COURT: Very well, gentlemen. That, of course, will leave the Court in this position that shortly after fifteen days has expired the Court should be advised if there is anything further.

Gentlemen, thank you very much. I apologize to everybody for being so late. Each party is entitled have the case developed as fully as conditions and circumstances and information available will permit.

The Court will now be in recess.

By the agreement of court and both counsel, the record was "closed" and the case "under submission" fifteen days after the second day of trial. The ordinary meaning of these references is that the record was made and the court was free to render final judgment thereon, which the court did. Previously, plaintiffs had rested after representative plaintiffs and seven other witnesses had testified. The record reflects no reservation of further testimony on individual claims. The representative plaintiffs had each attempted to prove up entitlement to individual relief by their respective testimony. Moreover, in its memorandum opinion the district court clearly evinced an expectation that class members seeking individual relief would testify thereto during appellants' case in chief. The Court specifically observed that "no other teacher than the named teachers appeared seeking relief in the nature of back pay, reinstatement, or claimed discrimination." Lastly, in oral argument before this Court, counsel for the parties indicated that there was no understanding between court and counsel that the trial was other than plenary, nor was any offer of proof made.

Under these circumstances, there is no basis for remand to the district court to entertain individual claims in a supplemental proceeding. Not unlike *Clark v. Mann*, 562 F.2d at 1110–11, in which there was confusion over the composition of the class, the most we can assume from appellants' arguments on appeal is that there may have been a misunderstanding between court and counsel on the order of proof and the number of class members seeking individual forms of relief. The district court reasonably believed that the parties agreed to and

---

11. Judge Harris was referring to supplementary evidence not available at trial and not germane to this appeal.

did present him with a plenary submission and there is nothing in the record before us to indicate to the contrary. "If there was a misunderstanding, the responsibility therefor rests with plaintiffs." *Id.* at 1111. The situation. might be different if appellants had brought the issue to the attention of the district court by post-judgment motion, or had appellants unsuccessfully attempted to rest with a reservation of a right to supplement the record; but for all this record shows, court and counsel agreed that all issues were presented to the court prior to the judgment appealed from.

█ We do not imply, however, that class members have foregone any opportunity to claim individual relief. First, as in *Clark, supra,* our determination is "without prejudice to the right of the other members of this or any other class to initiate a new action if they see fit." 562 F.2d at 111. In view of the peculiar responsibility to absent class members on the part of the trial court and representative counsel implicit in Rule 23, F.R.Civ.P., and because the agreement concerning the presentation of individual claims occurred only after trial thus prohibiting any form of notice to the class that such claims might be waived,[12] it seems evident that class members whose claims were not actually litigated should not be estopped by res judicata. *See Montana v. United States,* 440 U.S. 147, 155, 164 n.11, 99 S.Ct. 970, 974, 979 & n.11, 59 L.Ed.2d 210 (1979). *See also Cotton v. Hutto,* 577 F.2d 453, 454 (8th Cir. 1978); *Sperry Rand Corp. v. Larson,* 554 F.2d at 875–76. Further, these same considerations might warrant an exercise of the district court's discretion under Rule 60(b)(6), F.R.Civ.P., to reopen the record upon proper motion. *See Clarke v. Burkle,* 570 F.2d 824, 831–32 (8th Cir. 1978). Our affirmance on the present record does not prevent the district court from entertaining a post-judgment motion for relief.

## IV.

The final issue on appeal concerns appellants' constitutional sex discrimination claim. The district court held that a prima facie case of unconstitutional sex discrimination had not been made and that no rebuttable presumption arose. We conclude that the district court's finding in this regard is clearly erroneous and contrary to recently articulated constitutional principles with respect to the assignment of specialty personnel and promotion of teachers to administrative positions.

█ Appellants do not distinguish the elements involved in a constitutional as opposed to a Title VII statutory claim of sex discrimination. The two actions are different, however, as the Supreme Court has recently made clear. The evidence raises the question of whether defendants violated the right of female teachers, administrators, and applicants to equal protection of the law, a claim cognizable under 42 U.S.C. § 1983. Title VII is not involved.

█ As a general proposition, the equal protection clause of the Fourteenth Amendment, substantively inherent in the Fifth Amendment, grants to public employees "a federal constitutional right to be free from gender discrimination" unless a gender classification serves important governmental objectives and is substantially related to the achievement of those objectives. *Califano v. Westcott,* — U.S. —, —, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979); *Davis v. Passman,* — U.S. —, —, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979). *See Califano v. Webster,* 430 U.S. 313, 316–17, 97 S.Ct. 1192, 51 L.Ed.2d 360 (1977); *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). In *Personnel Administrator of Massachusetts v. Feeney, supra,* the Su-

---

**12.** No issue has been raised with respect to whether the district court abused its discretion by failing to provide adequate notice to the class under Rule 23(d)(2) that the court would require class members claiming individual forms of relief to assert their claims during the plenary trial, or by failing to detail in a pretrial order pursuant to Rules 16, 23(d)(1), (5) the order of proof and procedure the court would follow to submit the case. *See generally Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. at 359, 98 S.Ct. 2380; *Sperry Rand Corp. v. Larson,* 554 F.2d at 875–76.

preme Court applied the equal protection principles articulated in *Washington v. Davis* and *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* supra "with equal force to a case involving alleged gender discrimination." —— U.S. at ——, 99 S.Ct. at 2293. The Court stressed, as it had in *Davis* and *Arlington Heights* that "purposeful discrimination is 'the condition that offends the Constitution.' " (citation omitted), *id.,* at least where a covert or overt gender-based classification is not in issue. Stated otherwise, purposeful discrimination is the subject of the inquiry absent a discernible non-neutral legislative or administrative classification subject to the important governmental interest/substantial relation test. Discriminatory purpose or motive is not a fundamental element in a Title VII action, however, though proof of discriminatory motive may be critical to a Title VII plaintiff's allegation of "disparate treatment." *See, e. g., International Brotherhood of Teamsters v. United States,* 431 U.S. at 335–36 n.15, 97 S.Ct. 1843; *Washington v. Davis,* 426 U.S. at 246–47, 96 S.Ct. 2040. The critical difference between Title VII and constitutional claim of employment discrimination is that the disparate impact of neutral employment practices, sufficient if not rebutted to establish a Title VII violation "is not the sole touchstone of an invidious racial discrimination" in violation of the equal protection clause. *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. at 265, 97 S.Ct. at 563, *quoting Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. 2040. Disparate impact as objective evidence is, however, relevant to, if not determinative of, the question of invidious discrimination. *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. 2040. Likewise, a pattern of employment decisionmaking which demonstrably favors one gender over the other provides evidence relevant to the issue of invidious purpose. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. at 266, 97 S.Ct. 555.

█ In *Feeney* the Supreme Court elaborated on what constitutes "discriminatory purpose": "It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." —— U.S. at ——, 99 S.Ct. at 2296. If employment decisions or policies in the public employment area are made in part "because it would accomplish the collateral goal of keeping women in a stereotypic and predefined place," the Constitution is violated. *Id.*

█ On appeal appellants appear to urge a disparate impact theory in mistaken analogy to Title VII.[13] In the district court, however, appellants presented sufficient objective and subjective evidence of discriminatory pattern accompanied by invidious discriminatory purpose in connection with assignment and promotion of female teachers to administrative and "specialty" positions[14] to compel the conclusion that appellants reached the threshold of a prima facie case of sex discrimination.

The record indicates that during the relevant years there were ten or eleven administrative and specialty positions. As noted, the administrative positions were the superintendent and the elementary and high school principals. The seven or eight specialty positions, which carried an increment in pay because of extra duties involved, consisted of various jobs—coaching, physi-

---

**13.** This case, even were it brought under Title VII, involves gender-based disparate treatment in which proof of discriminatory motive is critical, not the "disparate impact" of facially neutral classifications. *See International Brotherhood of Teamsters v. United States,* 431 U.S. at 335–36 n.15, 97 S.Ct. 1843; *Meyer v. Missouri State Highway Commission,* 567 F.2d 804, 807 (8th Cir. 1977), *cert. denied,* 435 U.S. 1013, 98 S.Ct. 1888, 56 L.Ed.2d 395 (1978). No neutral classification is in issue. Indeed, it could be argued quite the opposite is true—the school district had a covert but discernible policy of hiring only men for certain positions. *See infra* at 1301.

**14.** The record contains no compelling evidence of purposeful sex discrimination in any other regard.

cal education, counselor, agriculture and home economics teachers. The practice of the school district was that the three administrators usually came from the ranks of teachers, and the specialists were of course teachers compensated for extra duties.

With regard to the specialty positions, the home economics and girls' physical education teacher positions were occupied by women during the relevant years, while the other specialty positions were filled by men. Women teachers outnumbered men by a ratio of three or four to one with the net result that all or nearly all male teachers in the district had specialty positions while the great majority of women did not. With regard to pay, the women specialty teachers received less than the males, though this evidence was poorly developed. School board president W. F. Burney testified that "[i]t has . . . been the policy of the school to hire men" for coaching positions, App. at 24, and he agreed "that the men always get specialty jobs and the women almost never get specialty jobs." App. at 25. School superintendent Kirkland, prior to 1973 the principal at the high school and like Burney, a decisionmaker, agreed that the football, basketball, and track coaches had traditionally been men and that, with the exception of the girls' basketball coach (a special pay job established relatively recently), should continue to be men. App. at 76, 77. Kirkland candidly testified;

> [T]here is no evidence, to indicate that only men could perform those jobs, but again, this is something that has been traditionally done in this Country and I concur with it.

App. at 76. He also testified that men had previously taught girls' physical education and that men would be capable of coaching girls' basketball. In contrast, women were not qualified to coach male athletic teams because "I just feel that a man could do a better job of handling a group of young men like that, than a woman." App. at 81.

With respect to administrators, the evidence suggests that at the time of trial women were virtually disqualified from holding the position of high school principal

and, as a consequence, superintendent. Mrs. Todd, the elementary principal during the relevant years, was the lowest paid of the three administrators. In 1973 David Bagley, a high school teacher, was promoted to high school principal to replace Mr. Kirkland who assumed the duties of superintendent. Mrs. Todd was concededly better qualified than Bagley, App. at 60, but was not considered for the job. Mrs. Todd testified and did not indicate any interest in the high school principal or superintendent positions. However, Superintendent Kirkland did not indicate in his testimony that Todd's lack of interest was a factor in failing to consider her for the position. Instead, he testified that Todd was not considered "[b]ecause with the situation we had, and the students we had, I felt that we needed a man for the job." App. at 60. Thereupon occurred the following colloquy between appellants' counsel and Mr. Kirkland:

> Q Now, fully explain that please. The situation you had and the students you had _ _ _
>
> A Because with high school students I feel that men are stronger disciplinarians than women are, and this particular instance I felt we needed a man in this position because part of the job was to be at athletic events, this sort of thing _ _ to see that things _ _ _ everything goes off as it should and I felt that a man could do a better job than a woman.
>
> Q Well, what is the objective evidence that you have for arriving at the conclusion that a woman can't do those things?
>
> A I don't have any, Mr. Walker.
>
> Q Is that just a natural bias?
>
> A I suppose it is.

App. at 60–61.

Coupled with objective evidence showing a clear pattern of disproportionate gender representation in administrative and specialty positions, the testimony of school board president Burney and former principal and superintendent Kirkland strongly indicates that the sex of a teacher was an important part of assignment and promotion decisions in this area of the school district's employment. At the very least,

appellants made a prima facie showing that decisionmakers in the school district sought to maintain women teachers in a "stereotypic and predefined place" in the school district and the district court clearly erred in finding otherwise.[15] *See Orr v. Orr,* 440 U.S. 268, 283, 99 S.Ct. 1102, 1113, 59 L.Ed.2d 306 (1979); *Califano v. Webster,* 430 U.S. at 316–17, 97 S.Ct. 1192; *Califano v. Goldfarb,* 430 U.S. 199, 207, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977) (opinion of Brennan, J.); *Stanton v. Stanton,* 421 U.S. 7, 14–15, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975); *Schlesinger v. Ballard,* 419 U.S. 498, 508, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975). Indeed, the testimony of Burney and Kirkland would support a factual finding that the school district had a discernible policy or practice of hiring only men (or women) for certain specific administrative or specialty jobs. Such a finding would raise the question of whether the non-neutral gender classification could be justified as bearing a close and substantial relationship to important governmental objectives. *Craig v. Boren,* 429 U.S. at 197, 97 S.Ct. 451.

■ One final matter remains. The record is enigmatic with regard to the status of plaintiff/appellants as the representatives of the class of female teachers and applicants. The cause was tried as a class action by appellants. The district court stated in its memorandum opinion that it "determined from the onset of the trial in this case that this was an appropriate class action," App. at 35, but did not specify what class it was referring to. On the other hand, the district court observed that "[f]rom the testimony, the named plaintiffs do not claim discrimination on the basis of sex," App. at 20, though it is apparent appellants did attempt to prove invidious discrimination against the class of female teachers whose interests they shared while employed by the district. Our review of

the record does not reveal the presence of any order required by Rule 23(c)(1) determining whether the action may be maintained as a class action. Counsel for appellants stated at argument, however, that the district court in fact declined to certify appellants as representatives of the female class. In passing, counsel urged that it was error not to do so, but because this question was not briefed and we do not have the benefit of a class determination order, this Court is obviously in no position to assess whether the district court abused its discretion. *Cf. International Woodworkers Local 5–475 v. Georgia-Pacific Corporation,* 568 F.2d 64, 67 (8th Cir. 1977); 3B J. Moore and J. Kennedy, Moore's Federal Practice, ¶ 23.-50, at 23–422, –423 (1978). On remand the district court should determine whether plaintiffs are appropriate representatives of the class of female teachers and applicants pursuant to Rules 23(a), (b)(2), F.R.Civ.P., and enter an appropriate order. Though we recognize post-judgment determination of a class is unusual, *see Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177–78, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), in the peculiar circumstances of this case it is a necessary predicate to the award of class-based equitable relief.

■ The district court observed that the school district "presented substantial testimony that no sex discrimination existed in the operation of the school system," but the court did not elaborate in view of its finding on the prima facie issue. Accordingly, on remand the district court should, on the basis of the present record,[16] determine (1) by appropriate order whether the named plaintiffs may sue as representative parties on behalf of the class of all female teachers and applicants; (2) if the cause may be maintained as a class action, whether the evidence of no sex discrimination referred to by the district court rebuts the presump-

---

**15.** Unlike the district court, we have the advantage of having the intervening *Feeney* decision before us.

**16.** As noted *ante,* the record was closed and the case submitted after two days of trial, a procedure we have no basis to disturb on appeal. However, our caveat with respect to the res

judicata effect of the court's judgment under these circumstances, and observations that the district court has the authority to reopen the record applies with equal force to the individual sex discrimination claims of female teachers and applicants.

tion in favor of class-wide equitable relief (similar to that granted on appellants' race discrimination claims); [17] and (3) whether the presumption in favor of individual relief has been rebutted with respect to those women who testified. Judgment may then be entered on the district court's supplemental findings and conclusions.

The district court made reference in its opinion to what could be viewed as a lack of evidence to enable the named parties to take advantage of the presumption in favor of individual relief. If so, the district court will no doubt make appropriate findings on remand.

For the foregoing reasons we affirm the district court's findings, conclusions, and judgment entry as it relates to the allegations of unconstitutional racial discrimination. We reverse the district court's dismissal of the class and individual claims for relief predicated on alleged unconstitutional sex discrimination to the extent it relates to the assignment of female teachers to specialty positions and promotion to administrative positions. We remand the cause to the district court for further proceedings consistent with this opinion.

Though the results here is mixed, because on this appeal appellants' counsel has successfully established a prima facie case of sex discrimination, we award costs on appeal to appellants including $500 in attorney fees. 42 U.S.C. § 1988.

Affirmed in part, reversed in part, and remanded.

17. Appellees correctly note that the notice of appeal states: "Plaintiffs appeal those portions of the judgment denying them individual relief" as it relates to the race and sex aspects of their complaint. Though in other contexts the litigation of class claims might be beyond the scope of an appeal thus framed, in the context of an employment discrimination case such as this in which individual claims for relief are incidental to and inextricably entwined with class claims by the rebuttable presumption concept, we cannot avoid reviewing the district court's prima facie findings. They are a predicate to individual relief. This Court pursues "a policy of liberal construction of notices of appeal in situations where intent is apparent and there is no prejudice to the adverse party . . . ." *Simpson v. Norwesco, Inc.*, 583 F.2d 1007, 1009 n.2 (8th Cir. 1978). *See Foman v. Davis*, 371 U.S. 178, 181–82, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In view of the close relationship of class and individual claims here, these requisites are satisfied.