Reversed and Remanded and Opinion filed May 1, 2003









Reversed and Remanded and Opinion filed May 1, 2003.

 




 
 
 
  
 
 
 




In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-02-00634-CV

____________

 

PHILLIPS PETROLEUM COMPANY, GPM GAS
CORPORATION, PHILLIPS GAS MARKETING COMPANY, PHILLIPS GAS COMPANY,

and GPM GAS TRADING
COMPANY, Appellants

 

V.

 

KATHRYN AYLOR BOWDEN, BEULAH POORMAN
VICK, OMER F. POORMAN, MONTE CLUCK, ROYCE YARBROUGH,

and BENNY TED POWELL, Appellees

 



 

On Appeal from the 268th District Court

Fort Bend County, Texas

Trial Court Cause No. 107968

 



 

O P I N I O N








In this interlocutory appeal, Phillips Petroleum Company, GPM
Gas Corporation, Phillips Gas Marketing Company, Phillips Gas Company, and GPM
Gas Trading Company appeal the trial court=s class certification order entered
in favor of royalty owners Kathryn Aylor Bowden,
Beulah Poorman Vick, Omer F. Poorman,
Monte Cluck, Royce Yarbrough, and Benny Ted Powell, individually, and on behalf
of themselves and all others similarly situated.  The trial court certified three separate
subclasses of royalty owners generally alleging that Phillips has engaged in
various inter-affiliate transactions resulting in its underpaying royalties to
the royalty owners.  Because the trial
court abused its discretion in certifying each of the three subclasses, we
reverse the certification order and remand the case to the trial court.  

                                                             I. 
Background

                                                                   A.  Bowden I

This is the second time this case has been presented to this
court on appeal.  Phillips Petroleum
Company, GPM Gas Corporation, Phillips Gas Marketing Company, Phillips Gas
Company, and GPM Gas Trading Company appealed a previous class certification
order.  See Phillips Petroleum Company
v. Bowden, No. 14-00-01184-CV (Tex. App.CHouston [14th Dist.] Oct. 18, 2001,
no pet.) (not designated for publication), 2001 WL 1249995 (“Bowden I”).  In Bowden I, this court held the trial
court abused its discretion in finding the class representatives satisfied all
the procedural prerequisites for class certification and, accordingly, reversed
the class certification order and remanded the case for further proceedings
without prejudice to further consideration of class certification.  Id. at *1.  








In the first certification order, Subclass 1 included royalty
owners whose royalties are to be paid on either an amount realized/proceeds or
market value basis.  Subclass 1 royalty
owners alleged that Phillips Petroleum Company (“Phillips”) breached an implied
covenant to market.  Subclass 2 included
royalty owners whose royalties are to be paid in accordance with a Gas Royalty
Agreement (“GRA”).  Subclass 2 royalty
owners alleged that Phillips erroneously failed to pay royalties on natural gas
liquids (“NGLs”), and instead payed
royalties only on the dry residue gas. 
Subclass 3 included royalty owners whose royalties are based on a
percentage of the proceeds and are to be calculated on either an amount
realized/proceeds or market value basis. 
Subclass 3 royalty owners alleged that Phillips breached the implied to
covenant to market by entering into percentage of proceeds contracts (“POP”
contracts) with its affiliate GPM that provided an unreasonably high fee to GPM
for processing the gas.  

Subclasses 1 and 3 royalty owners= claims were based on Phillips= alleged breach of the implied covenant
to market.  While Bowden I was
pending in this court, the Texas Supreme Court held there is no implied
covenant regarding the amount of royalty paid as to royalty owners who are paid
under market value royalty provisions.  Yzaguirre v. KCS Resources, Inc., 53 S.W.3d
368, 373 (Tex. 2001).  Therefore, if
Phillips acted in bad faith and sold gas at a rate substantially below market
value, it may be liable to royalty owners whose royalties are paid on the
amount realized/proceeds basis, but not to royalty owners whose royalties are
paid on a market value basis, for breach of the implied covenant to
market.  Bowden I, 2002 WL
1249995, at *4.  Phillips= compelling and distinct defense
against the royalty owners whose royalties are based on market value in
Subclasses 1 and 3 destroyed the typicality among the members of Subclasses 1
and 3.  Id. at *5.  

With respect to Subclass 2, Bowden I held the trial
court abused its discretion in finding that class representative Monte Cluck
satisfied the typicality and adequacy-of-representation requirements for class
certification.  Id. at *6.  In the absence of the nature of Cluck=s interests and any GRA that might
govern those interests, Cluck did not sustain his burden to prove that he is a
member of Subclass 2 or that he possesses the same interest and has suffered
the same injury as the members of that subclass.  Id. 
In Bowden I, this court further observed the certification order
included all royalty owners who had been paid under a GRA without specifying
the form of the GRA.  Id.  

                                            B.  Second Class Certification Order

On
remand, the trial court held a second class certification hearing and certified
the following three subclasses:








Subclass 1CRoyalty
owners who own or owned royalty interests under leases located in the state of
Texas; where Phillips Petroleum Company is the lessee; under the terms of the
lease, the payment of royalty of natural gas production is based on proceeds or
amount realized; from which Phillips Petroleum produced natural gas (including
natural gas liquids) that was directly or indirectly sold or transferred to
Phillips Gas Marketing for marketing or resale; and during the period February
1995 through the present.

Subclass 2CRoyalty
owners who own or owned royalty interests under leases located in the state of
Texas; where Phillips Petroleum Company is the lessee; the royalty is paid
pursuant to a Gas Royalty Agreement containing language substantially identical
to the language bracketed in the Gas Royalty Agreement attached as Exhibit 1
and incorporated herein by reference; the Gas Royalty Agreement has no
additional language relating to processing gas or the payment of royalty on
natural gas liquids; and during the period February 1995 through the present.

Subclass 3CRoyalty
owners who own or owned royalty interests under leases located in the Panhandle
of the state of Texas; where Phillips Petroleum Company is the lessee; the
leases provide for payment of royalties on natural gas production on an amount
realized/proceeds basis or market value/market price basis; from which Phillips
Petroleum produced natural gas (including natural gas liquids) that was
directly or indirectly sold or transferred to GPM (or any successor entity) for
marketing or resale; Phillips Petroleum Company was paid on the basis of a gas
purchase contract between Phillips and GPM (or any successor entity); and
during the period February 1995 through the present.

The new Subclass 1 differs from the old one in that it
includes royalty owners whose royalties are paid on only the amount realized or
proceeds basis and who are asserting claims for breach of both the implied
covenant to market and an express covenant to market.  The only change to Subclass 2 is the addition
of Royce Yarbrough and Ted Powell as class representatives.  Subclass 3 royalty owners, who include both
those paid on an amount proceeds and market value basis, now claim Phillips
breached the implied covenant to manage and administer the lease by entering
into POP contracts with GPM that pay GPM an unreasonably high fee to process
the gas.  








With
respect to Subclass 1, the trial court defined the common issues as:

Has Phillip Petroleum failed to reasonably market the
plaintiffs= gas?  Stated
another way, has Phillips Petroleum failed to act as a reasonably prudent
operator when it entered into a gas purchase agreement with its wholly-owned
affiliate, Phillips Gas Marketing, for prices less than could be achieved
through diligent marketing?

How much more, on a per unit basis, could Phillips
Petroleum have obtained for its gas if it had diligently marketed the gas
instead of simply selling it to Phillips Gas Marketing?  

With
respect to Subclass 2, the trial court defined the common issues as:

Has Phillips Petroleum=s
uniform practice of using only residue gas prices when computing and paying
royalties, and ignoring the values for natural gas components, constituted a
breach of the Gas Royalty Agreements?

What values for natural gas components should Phillips
Petroleum have used each month when computing and paying royalties under the
Gas Royalty Agreements?  

With
respect to Subclass 3, the trial court defined the common issues as:

In entering into POP contracts with its wholly-owned
subsidiary GPM, has Phillips Petroleum breached its covenant to manage and
administer the lease by allowing excessive processing charges to be deducted
from royalty payments?

By entering into POP contracts, how much greater were
the processing costs charged plaintiffs and class members than should have been
charged as reasonable costs?  

                                                    II. 
Standard of Review








The trial court=s ruling on class certification is reviewed
for abuse of discretion.  Texas Dep’t
of Transp. v. Barrier, 40 S.W.3d 153, 156 (Tex. App.CHouston [14th Dist.] 2001, no
pet.).  The trial court abuses its
discretion when it (1) does not properly apply the law to the undisputed facts;
(2) acts arbitrarily or unreasonably; or (3) rules on factual assertions not
supported by the record.  Spera v. Fleming, Hovenkamp
& Grayson, P.C., 4 S.W.3d 805, 810 (Tex. App.CHouston [14th Dist.] 1999, no
pet.).  While we must give deference to
the trial court=s assessment of the credibility of witnesses, the trial court=s exercise of discretion cannot be
supported by every presumption that can be made in its favor.  Schein v. Stromboe, 46 Tex. S. Ct. J.
103, 2002 WL 31426407, at *11 (Tex. Oct. 31, 2002).  In other words, the named plaintiffs must
demonstrate actual compliance with the requirements of Rule 42; such compliance
will not be presumed.  Id.  Thus, while the trial court=s ruling on class certification is subject
to abuse of discretion, there is no right to proceed as a class action.  Southwestern Ref. Co. v. Bernal, 22
S.W.3d 425, 439 (Tex. 2000).  Instead,
the plaintiff must satisfy all requirements for certification of the class as
set forth in Rule 42 of the Texas Rules of Civil Procedure.  Tex.
R. Civ. P. 42; Ford Motor Co.
v. Sheldon, 22 S.W.3d 444, 453 (Tex. 2000). 


The class action must first meet the four threshold
requirements set forth in Rule 42(a): (1) numerosity
(the class is so numerous that joinder is impracticable); (2) commonality
(there are common questions of fact and law); (3) typicality (the repre-sentative=s claims are typical of the class);
and (4) adequacy of representation (the representative parties will protect the
interests of the class).  Tex. R. Civ. P. 42(a).  Additionally, the class action must satisfy
at least one of the four categories found in Rule 42(b).  Tex.
R. Civ. P. 42(b).  With respect to
the Rule 42(b) requirement, appellees proceeded under 42(b)(4), which provides “the
questions of law or fact common to the members of the class predominate over
any questions affecting only individual members, and that a class action is
superior to other available methods for the fair and efficient adjudication of
the controversy.”  Tex. R. Civ. P. 42(b)(4).

                                                              III. 
Subclass 1








Phillips produces natural gas from
wells in Fort Bend and Brazoria Counties in which members of Subclass 1 own
interests and sells that gas to Phillips Gas Marketing Company (“PGMC”), a
Phillips subsidiary.  After gathering,
treating, and processing, PGMC sells the gas to third parties.  Subclass 1 royalty owners claim Phillips
breached both (1) express lease provisions addressing Phillips= duty to market the gas and (2) the
implied duty to diligently market the gas. 
Subclass 1 royalty owners complain their royalties are based on the
price at which Phillips sells the gas to PGMC, which is based on “two arbitrarily
selected index prices,” less 10 cents, rather than on the higher price at which
PGMC sells the gas to third parties. 
Phillips, on the other hand, contends the gas royalty clauses in the
Bowden[1]
oil and gas leases require that royalties be based on the amounts Phillips
realizes from sales of the gas “computed at the mouth of the well,” or on the
market value of gas “at the mouth of the well,” not on prices for downstream
sales to third parties after substantial value has been added by gathering,
treating, storing, and transporting the gas. 
There are at least 2,330 oil and gas leases granted or assigned to
Phillips in Fort Bend County and 538 leases granted or assigned to Phillips in
Brazoria County.  

                                                              A.  Predominance

Phillips claims individual questions will overwhelm any
common issues in Subclass 1.  Questions
common to the class are those questions which, when answered as to one class
member, are answered as to all class members. 
Spera, 4 S.W.3d at 810.  The threshold for commonality is not
high.  Graebel/Houston
Movers, Inc. v. Chastain, 26 S.W.3d 24, 33 (Tex. App.CHouston [1st Dist.] 2000, pet. dism=d w.o.j.).  Commonality does not require that all
questions of law and fact must be identical, but only that an issue of law or
fact exists that inheres in the complaints of all class members.  Id.; Spera,
4 S.W.3d at 811.  








As noted above, appellees proceeded under Rule 42(b)(4),
which requires common questions of law or fact of the class that predominate
over any questions affecting only individual members.  Tex.
R. Civ. P. 42(b)(4).  Because the
predominance requirement is far more demanding than the commonality
requirement, it acts as a check on the more flexible commonality test.  Bernal, 22 S.W.3d at 435 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591,
623 (1997)).  Therefore, because the predominance
requirement is so stringent, we consider it first.  Id. at 433; see also West Teleservices, Inc. v. Carney, 75 S.W.3d 455, 459 n.6
(Tex. App.CSan Antonio 2001, no pet.) (stating
predominance and commonality inquiries are subsumed into one).  

Predominance is determined by identifying the substantive
issues of the case that will control the outcome of the litigation, assessing
which issues will predominate, and determining if the predominating issues are
common to the class.  Bernal, 22
S.W.3d at 434.  The test for predominance
is not whether common issues outnumber individual issues, but whether common or
individual issues will be the object of most of the efforts of the litigants
and the court.  Id. (quoting Central
Power & Light Co. v. City of San Juan, 962 S.W.2d 602, 610 (Tex. App.CCorpus Christi 1998, writ dism=d w.o.j.)).  “If, after common issues are resolved,
presenting and resolving individual issues is likely to be an overwhelming or
unmanageable task for a single jury, then common issues do not predominate.”  Id. 
Thus, a judgment in favor of the class should settle the entire
controversy and all that should remain is for the other class members to file
their proofs of claim.  Id.
(quoting Life Ins. Co. of the Southwest v. Brister, 722 S.W.2d 764, 772
(Tex. App.CFort Worth 1986, no writ)). 

Rule 42(b)(4) sets forth a non-exhaustive list of factors for
guiding the court in determining the predominance requirement:  (A) the interest of members of the class in
individually controlling the prosecution or defense of separate actions; (B)
the extent and nature of any litigation concerning the controversy already
commenced by or against members of the class; (C) the desirability or
undesirability of concentrating the litigation in the particular forum; and (D)
the difficulties likely to be encountered in the management of a class
action.  Tex. R. Civ. P. 42(b)(4)(A)B(D). 









The royalty owners maintain these issues will be resolved by
submitting a single liability question asking whether Phillips failed to market
the gas with reasonable diligence.  They
allege Phillips engaged in a common course of conduct constituting a common
issue, i.e., Subclass 1 royalty owners are paid royalties based on the
amount realized from the sale of gas to Phillips= affiliate, PGMC.  Therefore, according to the royalty owners,
if a jury determines this common course of conduct constitutes a breach of
Phillips= duty as to one royalty owner, it
answers the question as to all royalty owners. 


As a threshold matter, however, the jury will have to
determine which royalty owners are included in Subclass 1, which is limited to
those whose royalties are paid on an amount realized/proceeds, not market
value, basis.  John Hafner,
a landman, was asked by the royalty owners to review
Fort Bend and Brazoria Counties records with regard to leases in Phillips= name.  Two of Hafner=s employees looked at the 2,330
leases in Fort Bend County and the 538 leases in Brazoria County.  Hafner found there
were differences among the royalty clauses in those leases.  For example, Hafner
found a number of leases that contained “two-pronged” royalty clauses.  Under a two-pronged clause, royalty is based
on “proceeds” when the gas is sold at the wells, but when the gas is sold or
used off the lease, royalty is based on “market value at the well.”  Hafner testified
that to determine which prong applies, one must determine where the particular
gas covered by the lease is sold or used, which necessarily requires a
well-by-well inquiry.  

Even after determining which royalty owners are members of
Subclass 1, before a jury can determine whether Phillips breached its duty to
market the gas diligently, it must first determine what duty Phillips owed to
each royalty owner with respect to its duty to market the gas.  Subclass 1 royalty owners allege that Phillips
breached both an implied covenant and an express covenant to market the gas
diligently.  The jury will have to
determine which leases contain an express covenant covering Phillips= duty to market the gas.  There is no implied covenant when the oil and
gas lease expressly covers the subject matter of the implied covenant.  Yzaguirre,
53 S.W.3d at 373.  A covenant cannot be
implied into an oil and gas lease without first examining the express terms of
the lease.  Union Pac. Res. Group,
Inc. v. Neinast, 67 S.W.3d 275, 284 (Tex. App.CHouston [1st Dist.] 2001, no pet.)
(citing Gulf Prod. Co. v. Kishi, 129 Tex. 487,
103 S.W.2d 965, 969 (1937)).  








Hafner testified that at least 89 percent
of the Phillips leases in Fort Bend County contain an express clause concerning
the lessee=s duty to market.  Hafner further
testified some Phillips leases in Brazoria County also contain express clauses
dealing with the lessee=s duty to market.  The
task of determinating which leases contain provisions
expressly addressing Phillips= duty to market the gas cannot be accomplished without an
individual examination of each lease.  

Moreover, a review of the record reflects that even among
leases containing an express covenant with respect to Phillips= duty to market the gas, there are differences
among those express clauses.  Therefore,
each lease containing an express covenant may impose duties on Phillips that
differ from those in other leases, and Phillips= duties with respect to each royalty
owner can only be ascertained after reviewing each individual lease.  

Finally, a number of leases do not contain an express clause
setting forth Phillips= duty to market the gas. 
With respect to those leases, the royalty owners claim Phillips breached
the implied covenant to market the gas diligently.  The jury will have to ascertain Phillips= duty with respect to marketing the
gas under the implied covenant to market the gas before it can make any
determination as to whether Phillips breached the implied covenant.  








Even assuming the jury is able to determine Phillips= duty to market gas relative to each
royalty owner, whether based on an express or implied covenant, the jury will
have to decide whether Phillips breached the express or implied covenant based
on whether Phillips acted as would a reasonably prudent operator under the same
or similar circumstances.   See Amoco
Prod. Co. v. Alexander, 622 S.W.2d 563, 567B68 (Tex. 1981) (“The standard of care
in testing the performance of implied covenants by lessees is that of a
reasonably prudent operator under the same or similar facts and circumstances.”).  Additionally, the implied covenant to market
the gas includes a duty to obtain the best price reasonably possible for the
marketed production.  Hutchings v.
Chevron U.S.A., Inc., 862 S.W.2d 752, 760 (Tex. App.CEl Paso 1993, writ denied); R.
Hemingway, Law of Oil and Gas at
483 (West 3d ed. 1991).  Therefore, “[d]etermining the best reasonably attainable price under same
or similar circumstances necessarily contemplates a fact specific,
location-by-location inquiry for each lease.” 
Neinast, 67 S.W.3d at 284.  

The royalty owners contend this case is manageable based on
the fact that Phillips has administered royalty owners= interests for many years, tracking
their lease history, lease terms, volumetric history, and all other information
it deems necessary in order to calculate royalty payments on its computer
system.  The royalty owners assert
Phillips maintains all relevant information on its computer system.  

The royalty owners= argument, however, ignores the fact
that the jury must first determine what Phillips= duties were with regard to each
lease and then whether Phillips breached its duties.  The royalty owners have not shown that
Phillips= computer system contains such
information.  The only way to ascertain
the scope of Phillips= duties owed to each royalty owner under each lease is by
examining each lease.  

The royalty owners further attempt to justify class
certification in this case by arguing that “[b]ecause
this case affords extraordinary economies to all parties and the judiciary at
large, and a class certification is the only way that a vast majority of the
royalty owners will ever receive any justice, class treatment is unquestionably
superior to any alternatives.”  According
to the royalty owners, “[t]he potential recovery for each of the royalty owners
does not represent a significant enough interest such that an individual action
is more desirable. . . . Indeed, their recovery would be small in comparison to
the costs of prosecuting their individual claims.”  Although recognizing it may not be
economically feasible to pursue some claims outside a class action, Bernal
stressed there is no right to litigate a claim as a class action; rather, the
trial court may certify a class action only if the plaintiffs satisfy all
requirements of Rule 42.  Bernal,
22 S.W.3d at 439.  

Thus, a common liability question cannot determine Phillips=s duty as to each lease.  Because individual issues regarding duty and
breach will predominate over common issues, the trial court abused its
discretion in certifying Subclass 1.  








                                                              IV. 
Subclass 2

The crux of the dispute underlying Subclass 2 royalty owners= claims against Phillips is the
interpretation of the GRA=s between Phillips and the royalty owners as to how royalties
are to be calculated under the GRA=s. 
GRA=s provide a different basis for
measuring royalties on natural gas from the measures set forth in the oil and
gas leases.  Phillips sells the gas at or
near the wellhead to its wholly-owned subsidiary GPM, which, in turn, gathers
and transports the gas to a processing plant to remove the natural gas liquids
(“NGL=s”). 
GPM sells the dry residue gas to third parties while selling most of the
NGL=s to Phillips.  Subclass 2 royalty owners complain that GPM
calculates royalty based on the weighted average sales price received for the
dry residue gas, without considering the proceeds it receives from the sale of
NGL=s in breach of the GRA=s. 
Phillips, on the other hand, argues the GRA=s do not provide for royalties to be
paid on the NGL=s.  Subclass 2 royalty
owners advised the trial court there are 3,000 to 4,000 GRA=s covering leases in the Texas
Panhandle. 

                                                              A.  Predominance








Phillips argues the trial plan demonstrates that the trial
court has decided the GRA=s are ambiguous. 
Specifically, Phillips contends that by requiring the jury to find the “formula
that the defendants should have used to compute royalty payments under the GRA=s,” the trial court has determined
the GRA=s to be ambiguous.  That is, if the trial court had not
determined the GRA=s are ambiguous, the jury would not need to find a “formula”
that is already set forth within the four corners of each GRA.  See Exxon Corp v. West Tex. Gathering Co.,
868 S.W.2d 299, 302 (Tex. 1993) (stating trial court=s determination as to ambiguity is
implicit in its decision to submit extent of defendants= liability to jury which required
jury to determine on basis of extrinsic evidence which interpretation parties
intended).  We agree.[2]


The
royalty owners contend the fact the trial court plans to submit a jury question
on whether the GRA=s were breached does not warrant an implied finding of
ambiguity.  They assert the trial court,
instead, intends only to ask the jury whether Phillips breached the GRA=s, but does not intend to ask the
jury to interpret the terms of the GRA=s and would instruct the jury
regarding Phillips= obligations under the GRA=s. 
A review of the trial plan belies the royalty owners= assertion.  With respect to Subclass 2, the trial plan
provides the following:  

Subclass 2 set above will have a single liability
question of whether there was a breach of contract with respect to the GRAs.

                                                                   *        *       
*

The damage question for Subclass 2=s express breach of contract claim will require the
jury to state the formula that the defendants should have used to compute
royalty payments under the Gas Royalty Agreements.  Once that answer is obtained, the computation
of individual royalty owners= damages will again be an administrative function that
can be accomplished using the historical data contained in Phillips= computer system.[3]  








Whether a contract is ambiguous is a question of law for the
court=s determination.  Heritage Res., Inc. v. NationsBank,
939 S.W.2d 118, 121 (Tex. 1996).  If the
contract is subject to two or more reasonable interpretations, the contract is
ambiguous, thereby creating a fact issue on the parties= intent.  Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., 940 S.W.2d 587, 589 (Tex. 1996).  On the other hand, if the written instrument
is worded so that it can be given a certain or definite legal meaning or
interpretation, then it is not ambiguous and the court will construe the
contract as a matter of law.  Coker v.
Coker, 650 S.W.2d 391, 393 (Tex. 1983). 
The fact that the parties put forth conflicting interpretations does not
create an ambiguity.  Columbia Gas
Transmission Corp., 940 S.W.2d at 589. 


By its stated intention to ask “the jury to state the formula
that the defendants should have used to compute royalty payments under the [GRA=s],” the trial court, at the very
least, has implicitly found the GRA=s are ambiguous.  Phillips claims that because the trial court
has determined the GRA=s are ambiguous, individual questions will predominate with
regard to the jury having to determine what each Subclass 2 royalty owner and
Phillips intended when they entered into the GRA=s. 
We agree.  The intentions and
understandings of individual royalty owners who executed GRA=s probably varied from owner to
owner; therefore, the determination of one GRA owner=s intent will not necessarily answer
the intent inquiry for any other class member. 
If the GRA=s are ambiguous as the trial court has determined, the intent
of the parties to each of the 3,000 to 4,000 GRA=s will have to be tried to the jury
separately.  See Wal-Mart v. Lopez,
93 S.W.3d 548, 557 (Tex. App.CHouston [14th Dist.] 2002, no pet.) (finding that in class
action involving breach of contract claim, any determination with regard to “meeting
of the minds” necessarily requires individual inquiry into what each class
member and each Wal-Mart employee who allegedly made offer said and did).  Such individual determinations will overwhelm
the trial court and the jury.  Therefore,
individual issues regarding the GRA=s will predominate over common
issues.  

                                                  B.  Adequacy of Representation

After Bowden I, Monte Cluck
withdrew as representative for Subclass 2. 
Royce Yarbrough and Ted Powell were added as representatives for
Subclass 2.  








                                                           1.  Royce Yarbrough

Phillips contends Yarbrough cannot adequately represent
Subclass 2 because of intra-class antagonism. 
The named representatives must fairly and adequately protect the
interests of the class members.  Tex. R. Civ. P. 42(a)(4). 
Adequacy of representation has two elements:  (1) an absence of antagonism between the
class representatives and the class members, and (2) an assurance the representatives
will vigorously prosecute the class claims and defenses.  Graebel/Houston
Movers, Inc., 26 S.W.3d at 32; E & V Slack, Inc. v. Shell Oil Co.,
969 S.W.2d 565, 568 (Tex. App.CAustin 1998, no pet.). 
The adequacy inquiry serves to uncover conflicts of interest between the
named parties and the class they seek to represent.  Amchem
Prods., Inc., 521 U.S. at 625.  

Adequacy of representation is a question of fact that must be
determined by reference to the individual circumstances of each case.  Entex, a Div. of Noram
Energy Corp. v. City of Pearland, 990 S.W.2d 904, 915 (Tex. App.CHouston [14th Dist.] 1999, no
pet.).  Factors affecting this
determination include:  (1) adequacy of
counsel; (2) potential for conflicts of interest; (3) the personal integrity of
the plaintiffs; (4) the representatives= familiarity with the litigation, and
their belief in the legitimacy of the grievance; (5) whether the class is
unmanageable because of geographical limitations; and (6) whether the
plaintiffs can afford to finance the class action.  Forsyth v. Lake LBJ Inv. Corp., 903
S.W.2d 146, 150 (Tex. App.CAustin 1995, writ dism=d w.o.j.) (op. on reh=g). 









The primary consideration in whether the representative
parties will fairly and adequately protect the interests of the class is a
determination of whether any antagonism exists between the interests of the
plaintiffs and those of the remainder of the class.  Adams v. Reagan, 791 S.W.2d 284, 291
(Tex. App.CFort Worth 1990, no writ).  Speculative claims of class conflict are not
sufficient to establish that the trial court abused its discretion in finding
adequate representation.  Employers Cas. Co. v. Texas Ass’n of Sch. Bds. Workers’ Compensation Self-Ins. Fund, 886 S.W.2d
470, 476 (Tex. App.CAustin 1994, writ dism=d w.o.j.).  Only a conflict that goes to the very heart
of the litigation will defeat a party=s claim of representative
status.  Forsyth, 903 S.W.2d at
151; Adams, 791 S.W.2d at 291.  

There are two methods for measuring natural gas.  The first is to measure the volume of space
the gas occupies at a specified pressure and temperature; that volumetric unit
of measure is 1,000 cubic feet or “Mcf.”  The second method is by the heating content
of the gas, which varies depending on the mix of hydrocarbon and inert,
non-hydrocarbon molecules that exists within gas streams.  The measure of heating content is a British
thermal unit, or “Btu.”  

Under the current system, Phillips pays royalties on the
total volume of gas produced in Mcfs, regardless of
the heating quality or Btu content of any particular stream of gas.  Phillips argues the GRA=s require royalties to be paid based
on the volume of natural gas produced from the wells.  Subclass 2 royalty owners seek a higher
royalty payment for royalty owners whose property produces gas having a high
Btu content.  Phillips argues that while
royalty owners whose leases produce high Btu content gas will receive a greater
royalty than they currently receive under their proposed interpretation of the
GRA=s, royalty owners whose leases
produce low Btu content gas will receive less royalty than they now receive.

Phillips contends that Subclass 2 representative Yarbrough is
currently paid for the full volume of gas coming from a certain well despite
its high nitrogen and low Btu content, as if the entire volume were pipeline
quality residue gas.  If the GRA price
must be adjusted for the Btu content of particular gas streams, the adjustment
for Yarbrough=s low Btu content would be downward;
therefore, Yarbrough likely will receive less royalty for this gas than she
currently receives.  In her testimony at
the second certification hearing, Yarbrough acknowledged that if this suit is
successful, she may receive less royalty. 









Kris Terry, Phillips=s expert witness, analyzed one of
Yarbrough=s wells, the “Virgil well,” and
concluded that well would generate less royalty under the royalty owners= interpretation of the GRA=s. 
Terry testified that one of Yarbrough=s wells produces gas of which 17
percent is an inert, non-hydrocarbon substance (nitrogen) and, therefore, has a
low heating value or low Btu content. 
Because Yarbrough is being paid for the full volume of gas coming from
that well as though the entire volume were pipeline quality gas, if the GRA
price must be adjusted for the Btu content of the gas streams produced from
Yarbrough=s well, the adjustment for the low
Btu content would lower Yarbrough=s current royalty payment on that
well.  

“‘It is axiomatic that a putative representative cannot
adequately protect the class if his interests are antagonistic to or in
conflict with the objectives of those he purports to represent.’”  Pickett v. Iowa Beef Processors, 209
F.3d 1276, 1280 (11th Cir. 2000) (quoting 7A Charles Alan Wright & Arthur
R. Miller, Federal Practice and Procedure ' 1786 at 326 (2d ed. 1986)).  Furthermore, a class action cannot be
maintained when the class members have opposing interests or when it includes
members who benefit from the same acts alleged to be harmful to other class
members.  See, e.g., Stirman v. Hunter, 280 F.3d 554, 563 (5th Cir. 2002)
(finding class representative inadequate when she had already agreed to abide
by Texas statute of limitations even though this might cause other class
members who might live in other jurisdictions with longer statutes of
limitations to lose some of their claims); Pickett, 209 F.3d at 1280-81
(finding named plaintiffs could not provide adequate representation to class
that included those who claim harm from the same acts from which other members
have benefitted); Bieneman
v. City of Chicago, 864 F.2d 463, 465 (7th Cir. 1988) (finding no abuse of
discretion in trial court=s refusal to certify class action for airport noise case on
basis that some class members will benefit from increased operations at
airport); Bolin Farms v. American Cotton Shipper Ass’n,
370 F. Supp. 1353, 1357 (W.D. La. 1974) (finding named plaintiffs= interests antagonistic to other
class members who have benefitted from contract being
challenged); E & V Slack, Inc., 969 S.W.2d at 568 (finding named
representatives could not adequately represent class in light of existence of
conflict of interest between named representatives and other class
members).  








Many of the members of Subclass 2 benefit from the very
method of calculating royalties that is being challenged.  Therefore, this conflict between royalty
owners with low Btu content and those with high Btu content goes to the very
subject matter of Subclass 2=s claims and is not speculative.  Given this conflict, Yarbrough cannot provide
adequate representation to a class that includes both members that will benefit
and members who will be harmed by the royalty owners= proposed interpretation of the GRA=s. 


                                                                 2.  Ted Powell

Phillips
also contends Ted Powell did not sustain his burden to establish his adequacy
as a class representative because the trial court did not have his deposition
at the time it signed the class certification order.  The royalty owners did not propose Powell as
a representative for Subclass 2 until they filed their Seventh Amended PetitionCafter the second certification
hearing.  In a letter dated April 17,
2002, the royalty owners informed the trial court that they were adding Powell
as a Subclass 2 representative:

[S]ince the second hearing,
plaintiffs have amended their petition to make the following changes:

A new class representative has been added, Ted Powell,
for the GRA class, subclass number 2. 
Mr. Powell=s gas has a high Btu content and thus there is no
question but that he would benefit from a payment method as called for in the GRAs in which he received payment for his liquids.  Mr. Powell=s
deposition is being scheduled.  That
transcript will be filed with this Court so that Your Honor can be satisfied
that Mr. Powell is an adequate class representative.








The royalty owners maintain the trial court received a copy
of Powell=s deposition before it signed the
certification order on June 14, 2002, and therefore had sufficient evidence to
support its findings.  By letter dated
June 14, 2002, which indicates a copy of Powell=s deposition was enclosed, the
royalty owners advised the trial court of Powell=s qualifications to serve as a
Subclass 2 representative.  Although the
June 14, 2002 letter is included in the clerk=s record, there is nothing to show
that Powell=s deposition was attached to the
letter.  The copy of Powell=s deposition included in the clerk=s record is file stamped “June 28,
2002;” the index to the supplemental clerk=s record on appeal indicates Powell=s deposition was filed on June 23,
2002.  

In reviewing the trial court=s class certification order, an
appellate court may not consider material that was not before the court at time
the trial court made its ruling.  State
Indus., Inc. v. Fain, 38 S.W.3d 167, 169 (Tex. App.CWaco 2000, pet. denied); Monsanto
Co. v. Davis, 25 S.W.3d 773, 781 (Tex. App.CWaco 2000, pet. dism=d w.o.j.); Methodist Hosps. of Dallas v. Tall, 972 S.W.2d 894, 898 (Tex.
App.CCorpus Christi 1998, no pet.).  There is nothing in the record to establish
that Powell=s deposition was before the trial
court at the time it signed the class certification order.  In the absence of Powell=s deposition, there is no evidence of
Powell=s adequacy as a representative of
Subclass 2.  

Because the trial court has determined the GRA=s are ambiguous, individual issues
regarding the intent of each party entering into a GRA will have to be determined,
and thus predominate over common issues. 
Furthermore, because of intra-class antagonism, Yarbrough cannot
adequately represent Subclass 2. 
Finally, because there was no evidence before the trial court regarding
Powell=s qualifications to serve as Subclass
2 representative at the time it signed the class certification order, Powell
has not shown that he can adequately represent Subclass 2.  Therefore, the trial court abused its discretion
in certifying Subclass 2.

                                                               V. 
Subclass 3








Phillips sells gas to its wholly owned subsidiary GPM under
gas purchase contracts known as percentage of proceeds contracts (“POP
contracts”).  Under the POP contracts,
the transfer price from GPM to Phillips is calculated as a certain percentage
of the weighted average sales price received by GPM from third parties.  Subclass 3 royalty owners claim GPM retains a
certain amount of the value of the residue gas and the NGL=s as a “fee” for marketing and
processing the gas.  According to the
royalty owners, the percentage of proceeds that GPM paid to Phillips is
typically between 78% and 82%; therefore, the fee retained by GPM was between
22% and 18%.  Because Subclass 3 royalty
owners are paid royalties based on the net percentage of proceeds that Phillips
receives, the higher the fee retained by GPM, the less royalties received by
the royalty owners.  Subclass 3 royalty
owners, both proceeds and market value owners, claim Phillips has breached the
implied covenant to manage and administer their leases as a reasonably prudent
operator by charging excessive post-production processing fees based on a
percentage of proceeds.  

Phillips contends the percentage split is nothing more than
part of the formula utilized for calculating the price GPM is obligated to pay
Phillips for gas delivered at the wellhead. 
Phillips states it does not charge or deduct any amount from the price
Phillips receives from GPM for gas delivered at the wellhead before paying
royalties; instead, royalty owners receive their fractional share of exactly
the same price Phillips receives for its sales of gas at the wells.

                                                             A.  Class Members

Although
the trial court=s certification order includes royalty owners whose royalties
are paid on both amount realized/proceeds and market value bases, the royalty
owners requested in their Seventh Amended Petition, which was filed after the
second certification hearing, that Subclass 3 be certified for only “proceeds
or amount realized” leases, not market value leases.  The royalty owners state they informed the
trial court by letter dated April 17, 2002, that they intended to include
market value leases.  However, the April
17, 2002 letter does not support this assertion.  The letter states with regard to Subclass 3:

Additionally, since the second hearing, plaintiffs
have amended their petition to make the following changes:

                                                                   *        *       
*

$          We have
limited subclass number 3, the POP subclass, to the Panhandle.  Since Mr. Cluck, the POP class
representative, is located in the Panhandle, we have limited that class to that
area.








$          An
express contract claim for leases that have an express obligation to market the
gas has been added to subclasses 1 (Fort Bend and Brazoria) and 3 (POP).

The royalty owners= petition does not support a claim
for breach of the implied covenant to manage and administer leases that base
royalties on market value.  

                                                              B.  Predominance

Phillips contends individual issues with regard to Subclass 3
royalty owners= claims under the POP contracts will predominate
over any common issues.  We agree.  There are hundreds of POP contracts with
different percentages between Phillips and GPM at issue.  The percentage under each POP contract was
negotiated based on the particular circumstances of the gas being sold.  To determine if Phillips breached its duty to
manage and administer Subclass 3 royalty owners= leases,[4]
the jury will have to conduct an intensive factual inquiry into the
circumstances surrounding each POP contract. 
Factors to consider include well distance from GPM=s gathering system, availability of
gas for sale by Phillips, and Phillips= alternatives for selling gas other
than to GPM.  Inquiry into these factors
requires individualized proof, which undoubtedly will overwhelm the trial court
and the jury.  Thus, individual issues
will predominate over common issues.  

The trial court abused its discretion in certifying Subclass
3 by including market value leases when there is no support for such claims in
the royalty owners= pleadings.  Moreover,
individual issues will predominate over common issues.




                                                            VI.  Res
Judicata

Phillips also asserts the trial court abused its discretion
in certifying each of the three subclasses because res judicata will bar other
breach of contract claims not asserted in this action.  Res judicata, or claims preclusion, precludes
the relitigation of claims that have been finally adjudicated, as well as
related matters that should have been litigated in the prior suit.  State & County Mut.
Fire Ins. Co. v. Miller, 52 S.W.3d 693, 696 (Tex. 2001).  Texas follows the transactional
approach.  Barr v. Resolution Trust
Corp., 837 S.W.2d 627, 631 (Tex. 1992). 
Under that approach, a subsequent suit is barred if it arises out of the
same subject matter of the prior suit and which through diligence could have
been litigated in the prior suit.  Id.  The elements of res judicata are:  (1) a prior final judgment on the merits by a
court of competent jurisdiction; (2) identity of parties or those in privity
with them; and (3) a second action based on the same claims as were raised or
could have been raised in the first action. 
Amstadt v. U.S. Brass Corp., 919
S.W.2d 644, 652 (Tex. 1996).  

The trial court=s certification order specifically
excludes claims not included in the order. 
The royalty owners argue class members whose claims are not actually
litigated are not barred by res judicata. 
In other words, under the royalty owners= argument, if Phillips were to win a
take-nothing judgment against the class, individual royalty owners would still
be allowed to pursue claims for the under payment of royalties based on legal
theories not asserted in this action.








Rule 42(d) provides that “[w]hen appropriate (1) an
action may be brought or maintained as a class action with respect to
particular issues, . . .”  Tex. R. Civ. P. 42(d) (emphasis
added).  Phillips contends the
certification order impermissibly splits the class members= causes of action for breach of the
leases.  We agree with Phillips= contention.  All claims arising from a legal relationship
such as a lease or a contract will arise from the same subject matter and will
be subject to res judicata.  Musgrave
v. Owen, 67 S.W.3d 513, 520 (Tex. App.CTexarkana 2002, no pet.).  Here, the royalty owners have narrowly
crafted their claims for breach of implied and express covenants in an attempt
to satisfy all the requirements of Rule 42. 
The result of such crafting is that other potential breach of contract
claims will be precluded by res judicata.[5]  

While two other Texas courts of appeals have addressed the
preclusive effect of res judicata on claims not asserted in a class, the Texas
Supreme Court has yet to consider it.  See
Compaq Computer Corp. v. LaPray, 79 S.W.3d 779,
793 (Tex. App.CBeaumont 2002, pet. filed) (stating
that in class action, splitting claims may be appropriate; fact that defendants
engaged in course of activity giving rise to myriad claims, only some of which
are suitable for class treatment, does not mean certification is
inappropriate); Microsoft Corp. v. Manning, 914 S.W.2d 602, 610B611 (Tex. App.CTexarkana 1995, writ dism=d) (rejecting argument that by tailoring
class to exclude parties claiming consequential damages, trial court risks
subjecting claims for those damages to res judicata).[6]  Under well-established principles of Texas
law, the royalty owners must bring all claims relating to the breach of the
lease agreements in the same action or they will be subject to res judicata=s preclusive effect.  See Musgrave, 67 S.W.3d at 520.  








Although a class action may be maintained with respect to
particular issues “when appropriate,” Rule 42 is not meant to be an exception
to res judicata.  Intratex
Gas Co. v. Beeson, 22 S.W.3d 398, 405 (Tex. 2000).  We conclude the trial court=s class certification order
impermissibly splits claims for breach of the lease agreements.  Moreover, given the willingness of the class
representatives to abandon claims for the sake of achieving commonality, we
conclude they cannot adequately represent the three subclasses and the trial
court abused its discretion in certifying the class action.  

                                                            VII. 
Conclusion

We hold the trial court abused its discretion in granting
class certification as to each of the three subclasses.  We reverse the trial court=s class certification order and
remand the case for further proceedings consistent with this opinion.  

 

 

 

 

/s/        J. Harvey Hudson

Justice

 

 

 

 

Judgment rendered
and Memorandum Opinion/Opinion filed May 1, 2003.

Panel consists of
Chief Justice Brister and Justices Hudson and Frost.











[1]    Bowden, Vick,
and Poorman represent Subclass 1.





[2]  On remand
after Bowden I, Phillips moved for partial summary judgment asking the
trial court to find the GRA=s unambiguous and interpret the GRA=s as not requiring royalties to be calculated on the
price received for NGL=s when calculating the monthly Aweighted average price per Mcf
received by Lessee from all sales of gas.@  The trial court denied Phillips= motion for summary judgment without stating its
reasons for the denial.  Phillips argues
that in denying its motion for summary judgment, the trial court found the GRA=s to be ambiguous. 
Phillips also asserts that in response to its motion for summary
judgment the royalty owners argued in the trial court that the GRA=s are ambiguous. 
The royalty owners contend they never asserted the GRA=s are ambiguous. 
We need not address these arguments because the trial court implicitly
found the GRA=s to be ambiguous as presented in the trial plan.  





[3]  Emphasis
added.  





[4]  Phillips
argues there is no recognized general Aimplied
covenant to manage and administer the lease properly.@  Instead, it is
a description of Amiscellaneous@ implied
covenants found in a treatise, which include the specific implied covenants to
produce and market, to operate with reasonable care, to use successful modern
methods of production and development, and to seek favorable administrative
action.  R. Hemingway, Law of Oil and Gas at 542, 574 (West 3d
ed. 1991).  However, given our
disposition of Subclass 3, we need not address this argument.  





[5]  See,
e.g., Feinstein v. Firestone Tire & Rubber Co.,
535 F. Supp. 595, 606B07 (S.D.N.Y.
1982) (finding question of adequacy of representation exists when class
representatives are willing to assert on behalf of class only claims arising
from breach of warranty; such tailoring of claims to improve possibility of
demonstrating commonality presents putative class members with significant
risks of later being informed they had impermissibly split a single cause of
action); City of San Jose v. Superior Court of Santa Clara County, 12
Cal.3d 447, 464 525 P.2d 701, 712B13,
115 Cal.Rptr. 797, 808B09
(1974) (finding inadequate representation because by seeking damages for
diminution in market value, plaintiffs would be waiving, on behalf of class
members, any possible recovery of substantial damages).  





[6]  The court in Microsoft
relied on Marshall v. Kirkland, 602 F.2d 1282, 1298 (8th Cir.
1979).  In Marshall, the court
held individual class members= discrimination claims were not barred by res judicata
after the trial court=s adverse ruling on class discrimination claims.  Id.; see also Cooper v. Federal
Reserve Bank, 467 U.S. 867, 880 (1984) (holding judgment against class in
discrimination action did not bar subsequent individual claims for
discrimination).